UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | |
|---|---|
| THE UNITED STATES OF AMERICA, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | |
| ) Cause No.  1:21-cr-069 SEB-DML | |
| DYLAN OSTRUM, ) | |
| ) | |
| Defendant. ) | |

**UNITED STATES' RESPONSE AND
OPPOSITION TO DEFENDANT'S MOTION TO SUPPRESS**

The United States of America, by counsel, Michelle Brady, Assistant United States Attorney, hereby files its response and opposition to Defendant Dylan Ostrum's (hereinafter, Defendant) motion to suppress all evidence obtained as a result of the search of a Chrysler 300 located at a residence in Indianapolis, Indiana.

**STATEMENT OF FACTS**

The United States would proffer the below facts regarding the circumstances of the search in dispute, which are contained, in part, in the February 4, 2021 sworn affidavit of ATF Agent Todd Bevington (Dkt. 2), which is hereby incorporated by reference.  Additional relevant facts are set forth in the Declaration of Agent Bevington, Exhibit 1.  If called to testify about these facts, Agent Bevington would testify as indicated below.  Based upon the Defendant's

1

Motion to Suppress, there do not appear to be any dispute of material facts that would be relevant to the disposition of this motion.

**A.  January 28, 2021 Arrest of Defendant's Methamphetamine Source, Ricky Blythe**

On January 28, 2021, law enforcement officers with the ATF and with IMPD executed a search warrant at Ricky Blythe's Indianapolis, Indiana home. In searching Blythe's home on January 28, 2021, the ATF seized multiple firearms, as well as roughly a kilogram of methamphetamine. 1:21-cr-0047, Dkt. 2. As Defendant Ostrum was told on February 3, 2021 when the ATF searched his home, Blythe's phone was seized on January 28, and Blythe's phone contained a large number of text messages demonstrating that Blythe sold methamphetamine to Defendant, and Defendant sold marijuana to Blythe.

Based upon the evidence gathered on January 28, 2021, to include, in large part, the volume of text messages relaying a significant drug relationship between Blythe and Defendant Ostrum, a search warrant was sought for Defendant Ostrum's home. While Defendant Ostrum was not unknown to the investigating officers prior to January 28, 2021, the evidence seized from Blythe's home corroborated their information about Defendant Ostrum, solidifying their plan to continue their investigation involving Defendant Ostrum.

**B.  February 3, 2021 Search of Defendant's Home**

After obtaining evidence that Blythe and Defendant had a significant drug relationship, coupled with information they had otherwise obtained through their ongoing investigation, agents obtained a search warrant for Defendant

Ostrum's Indianapolis residence, which was executed on February 3, 2021. Defendant was present during this search of his home. Other than ammunition and a small quantity of marijuana, very little of evidentiary value was obtained from Defendant Ostrum's home, apart from the interview of the Defendant.

### C. Post-*Miranda* Interview of Defendant on February 3, 2021

After Defendant waived his *Miranda* rights, he spoke with officers at his home. Exhibit 2, Post-*Miranda* Recorded Interview of Defendant. Defendant acknowledged that he knew Blythe had been arrested, and that on the day Blythe was arrested, Blythe was supposed to have brought drugs to Defendant Ostrum, but Blythe never showed up.

Defendant originally claimed that he was only receiving "grams" of methamphetamine from Blythe, but once confronted with some of the text messages the agents had on Blythe's phone (some of which reference pound quantities of methamphetamine), Defendant acknowledged it was a larger amount (but steadfastly denied he ever received pound quantities from Blythe). During the interview, texts between Defendant and Blythe were discussed, including a text where Defendant thanked Blythe for giving him (Defendant) a gun, and a second text where Blythe was asking for a gun. Defendant was asked about a number of texts between Blythe and Defendant where the two discussed drugs—both marijuana and methamphetamine.

During the interview, Defendant was asked about his key ring, because there appeared to be keys to bank boxes on the ring. Defendant claimed they were actually keys to a safe, which he claimed was empty. "Oh, I don't have any

3

of that stuff here. I don't have any go [meaning, methamphetamine], I don't have any, I got bud [meaning, marijuana], no guns…" Defendant claimed that he "got rid of it [the drugs and guns]" after Blythe got arrested. Defendant was also asked about where his money was located; Defendant did not answer the question, but claimed he did not have, "that much [meaning, that much money]."

While at the house, agents noted the absence of a Chrysler 300 sedan at the house that they had seen at Defendant's residence on multiple occasions prior to February 3, 2021 (which they knew had a license plate to a Cadillac owned by Defendant, rather than to the Chrysler 300 to which the plate was affixed). Defendant was asked where his car, "the Chrysler" was at; Defendant responded that everyone thought it was his, when in fact it was just a rental, and that it was at his father's house. At the conclusion of the interview, Defendant claimed that he had moved a gun and "everything" to his dad's house, which he said was two hours away.

**D.    Agents Found, and Ultimately Searched, the Chrysler 300**

As a result of Defendant's statements, agents concluded the interview believing that Defendant had stored his contraband (drugs, drug proceeds, and firearms) at a different location following his methamphetamine source's arrest less than a week before their visit to his house (although they were skeptical these items would be found where Defendant claimed they were located, at his father's residence). As such, they continued their investigation.

As part of their investigation on February 3, 2021, investigators were able to locate the Chrysler 300 sedan they'd previously seen at Defendant's residence,

4

finding it backed into the driveway at a residence of one of Defendant's associates. Investigators made contact with the occupants of the residence, who stated that Defendant had parked the vehicle in the driveway the previous day, and that Defendant had locked the car and not given him any keys to the car.[1] The occupant of the residence signed a consent form to allow an Indianapolis Metropolitan Police Department (IMPD) K-9 officer and his certified narcotics K-9 to run an "open-air" sniff on the property (to include the Chrysler); when this occurred, the K-9 did not alert to the odor of narcotics at the Chrysler.

Officers were able to view the Chrysler's Vehicle Identification Number (VIN) through the windshield. That VIN was queried through law enforcement databases, and that query revealed that the Chrysler 300 was a rental car that had been reported stolen in October 2020. The query revealed that the car had been reported stolen and entered as a stolen vehicle into the National Crime Information Center (NCIC).

Since the Chrysler 300 was a stolen vehicle, it had to be towed from of the property, so that it could ultimately be claimed by the owner. Investigators conducted an inventory search of the vehicle in preparation to tow this stolen vehicle, which was conducted pursuant to the IMPD inventory search policy. See, Exhibit 3, IMPD General Order 7.3 (Towing/Impounding Vehicles). This

---

[1] It should be noted, this individual had a distinct odor of marijuana about his person when he was contacted by the police, and was not considered the most reliable of witnesses. As such, the police were not sure whether any spare sets of keys for the Chrysler had been made by Defendant in the months that he was driving this stolen vehicle, which may have been held by this individual, or at a separate location.

General Order defines a vehicle Inventory Search as "an administrative, routine, and warrantless search of the passenger area (including the glove compartment), trump, and closed containers, prior to lawfully towing a vehicle." See, Exhibit 3, p. 2.

While searching the vehicle, investigators located a safe in the trunk. Investigators utilized the key from Defendant's keychain to unlock the safe (they had seized the keys pursuant to the search warrant set forth at Exhibit 1-A). Inside the safe, investigators located a loaded Glock 9mm pistol, what later forensically tested as 513.5 grams of methamphetamine (actual), and what appeared to agents to be a drug ledger. Investigators located a second safe in the backseat of the vehicle; they used a key from Defendant's keychain to unlock that safe, and recovered an extended Glock magazine loaded with 9mm ammunition, approximately two pounds of marijuana, and a digital scale.

No other items of value were located during the inventory search of the vehicle. The Chrysler 300 was then towed from the property, and ultimately claimed by Avis Rental Car on February 9, 2021 from the IMPD Tow Lot.

## **POINTS AND AUTHORITIES**

Defendant has moved to suppress the evidence resulting from the stolen Chrysler 300. In so moving, Defendant claims that the search was conducted in violation of his rights under the Fourth Amendment of the U.S. Constitution, as well as the Indiana State Constitution.

However, Defendant's claim must fail, as the search of the Chrysler 300 on February 3, 2021 was reasonable under the Fourth Amendment. Specifically, the Defendant's motion must be denied, on any one of the three following bases:

(1) Defendant has no standing to object to the search of the stolen vehicle.

(2) The officers had developed sufficient probable cause to search the vehicle, based on the statements of Defendant on February 3, 2021, in conjunction with their overall investigation.

(3) Regardless, the stolen car had to be towed into IMPD custody so that it could be claimed by its owner, Avis Rental Cars; as such, the car was properly inventoried under IMPD General Order 7.3, and this evidence would have been seized by law enforcement regardless.

### A. **Defendant Lacks Standing to Object to the Search of the Car**

Defendant is not the registered, legal owner of the vehicle, which had been reported stolen by Avis Rental Cars in October 2020. According to Avis, the car had originally been rented by a female who never returned it, and Defendant had never been an authorized driver on that rental agreement. Accordingly, Defendant lacks any standing to object to the February 3, 2021 search of the vehicle.

"Fourth Amendment rights are personal rights which, like some other constitutional rights, may not be vicariously asserted." *Rakas v. Illinois*, 439 U.S. 128, 133-34 (1978). A person who is aggrieved by an illegal search and seizure only through the introduction of damaging evidence secured by a search

of a third person's premises or property (such as someone else's vehicle) has not had any of his Fourth Amendment rights infringed. *United States v. Yang*, 478 F.3d 832, 835 (7th Cir. 2009). *Id.,* at 134. A defendant objecting to a search as violative of the Fourth Amendment bears the burden of proving that he had a legitimate expectation of privacy in the area searched. *United States v. Yang*, 478 F.3d 832, 835 (7th Cir. 2009). To challenge a search, the defendant must show that he had both a subjective and objective expectation of privacy in the item searched. *United States v. Haywood*, 324 F.3d 514, 515-16 (7th Cir. 2003).

Here, Defendant has neither a subjective nor objective expectation of privacy in the Chrysler 300. The car was owned by Avis Rental Cars, and had been rented to a female earlier in 2020, but never returned, which resulted in the vehicle being reported stolen as of October 29, 2020. According to Avis, Defendant was never even an authorized driver of that vehicle. Defendant clearly knew the car was stolen, and attempted to hide his ongoing use of the vehicle by replacing the license plate with a plate from one of his own vehicles.[2]

"Thus, a car thief would not have a reasonable expectation of privacy in a stolen car no matter the degree of possession and control." *Byrd v. United States*, 138 S.Ct. 1518, 1522-23 (2018). See also, *Rakas v. Illinois*, 99 S.Ct. 421, Ftnt. 9 (1978) (criticizing lower courts that, "inexplicably have held that a person present in a stolen automobile at the time of a search may object to the

---

[2] Even if Defendant had an alternate explanation as to why he replaced the plates on the Chrysler 300 with those of a non-stolen vehicle, the fact remains, his claim to a privacy interest in a stolen car remains an interest that is not objectively reasonable.

lawfulness of the search of the automobile."); *United States v. Sholola*, 124 F.3d 803, 816 (7th Cir. 1997) (Footnote 14: "A person[ ] present in [a] stolen car [does] not have a reasonable expectation of privacy in [the] car[ ]" and thus lacks standing to challenge a search of the vehicle on Fourth Amendment grounds." *citing United States v. Garcia*, 897 F.2d 1413, 1417 (7th Cir.1990)).

In short, the Chrysler 300 that was searched on February 3, 2021 was a stolen car to which Defendant never had any possessory right. He therefore had no expectation of privacy in the contents of that car—either subjectively, or objectively—and his motion must be denied.

### B.     There Was Probable Cause to Search the Chrysler 300

Regardless of Defendant's lack of standing to object to the search of the car, under all of the circumstances known to the agents on February 3, 2021, probable cause existed to search the car, and the vehicle exception to the warrant requirement obviated any need to obtain a warrant before searching it. "Probable cause is something less than a preponderance." *United States v. Limares*, 269 F.3d 794, 798 (7th Cir. 2001)  "Probable cause to search exists where, based on the known facts and circumstances, a reasonably prudent person would believe that contraband or evidence of a crime will be found in the place to be searched." *United States v. Williams*, 627 F.3d 247, 251 (7th Cir. 2010).

In this case, as set forth in detail above, Defendant had just told agents that he had recently removed contraband from his house contemporaneous with the arrest of his methamphetamine source of supply, Ricky Blythe. Defendant claimed that he had brought a gun to his dad's house, as well as "everything"

else (which appeared to include the "go [methamphetamine]," the "bud [marijuana]," as well as the Chrysler 300). When officers found the Chrysler 300 at one of his confederate's homes, it was a natural conclusion that the contraband that Defendant claimed would be found at his dad's house was likely inside the vehicle (which he also had claimed would be at his dad's house).

The existence of probable cause remains, even in light of the K9's lack of alert for the presence of the odor of controlled substances. Even though the failure of the K9 to alert lessened any expectation of finding drugs (although they did find drugs—both methamphetamine and marijuana was seized from inside the two safes), the agents still had probable cause to believe there would be evidence of Defendant's drug trafficking activities, to include drug proceeds, other drug evidence, such as the drug ledger and scales they ultimately found in the car, as well as firearms.

"The exception for the search of a vehicle when there is probable cause to believe that evidence of criminal activity is present also is a solid basis upon which to predicate [a] search." *United States v. Paige*, 870 F.3d 693, 703 (7th Cir. 2017). "Probable cause to search a vehicle exists when, based on the totality of the circumstances, 'there is a fair probability that contraband or evidence of a crime will be found in a particular place.'" *United States v. Sands*, 815 F.3d 1057, 1063 (7th Cir. 2015) (quoting *Illinois v. Gates*, 462 U.S. 213, 238, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983)).

In this case, agents had probable cause to believe that evidence of Defendant's ongoing drug trafficking activity would be found inside the Chrysler

300. They had just executed a search warrant at his house, and despite their knowledge from the ongoing investigation that Defendant was engaged in the ongoing dealing in both marijuana and methamphetamine, there was little to no evidence of that drug dealing activity. Additionally, Defendant had informed agents that he had "gotten rid of" his drugs and at least one firearm; it stood to reason that he meant that he had removed it for safekeeping, not that he had thrown those expensive items in the trashcan. As such, when the officers found a car that Defendant had claimed was his at a residence of one of his confederates—not two hours away at his dad's house, as he had told officers it would be—their conclusion that it likely contained the missing contraband was both reasonable and accurate.

### C. The Inventory Search Was Properly Conducted

Even if the officers had lacked probable cause to search the vehicle, the contraband at issue would have been inevitably discovered due to the necessity to conduct an inventory search before impounding the car and ultimately turning the car back over to the rightful owner.

Inventory searches are a clear exception to the warrant requirement of the Fourth Amendment. As the Seventh Circuit explained in *United States v. Jackson*, 189 F.3d 502, 508 (7th Cir. 1999), "warrantless inventory searches of impounded vehicles by authorities pursuant to a standard police policy or procedure do not violate the Fourth Amendment." (citing *South Dakota v. Opperman*, 428 U.S. 364, 369 (1976)). This exception to warrantless vehicular

searches "allows police to search vehicles prior to impoundment so as to prevent false claims of loss of property or vehicular damage." *Id.*

The Seventh Circuit has repeatedly upheld the Constitutionality of inventory searches. "Such searches have been upheld because they serve important, non-investigatory interests that include: (1) protecting the owner's property after arrest; (2) protecting the police against claims or disputes over lost or stolen property; and (3) protecting police from potential danger." *United States v. Sholola,* 124 F.3d 803, 818 (7th Cir. 1997), citing Opperman, 428 U.S. at 369; *see also United States v. Griffin,* 729 F.2d 475, 481 (7th Cir. 1984), *cert. denied,* 469 U.S. 830, 105 S.Ct. 117, 83 L.Ed.2d 60 (1984).

Each of these recognized, important, interests existed in the instant case. Most importantly, officers had cause to believe there could be unsecured firearms and various controlled substances contained inside the car; before driving that car to the tow lot, they had a safety interest in ensuring no such item was inside the car.[3] In this case, officers knew that Defendant had drug proceeds that were unaccounted for from their search of the house (although Defendant claimed he did not have 'much'); the police had an interest in protecting themselves against any later claim from the Defendant that they had stolen his money from the car, if any was inside. Finally, Avis Rental Car had a property interest in that vehicle, and they were deserving of an inventory of the

---

[3] It is not unheard of for individuals to attempt to break into the tow lot and recover items from seized vehicles, adding to the public safety interest in securing any dangerous contraband from inside the car.

vehicle prior to its being returned to them (at least in part, to prevent any inadvertent possession of illegal contraband).

In this case, the agents had recovered a stolen vehicle on someone's private property. Clearly, the car had to be impounded so it could be returned to the lawful owner. These agents knew that the car had recently been used by a drug trafficker who sold methamphetamine and marijuana, and possessed multiple firearms (of unknown location). The suggestion that the police should have towed this car and then returned it to Avis without inventorying its contents to ensure the safety of the vehicle is simply untenable.

### D.   No Evidentiary Hearing Is Warranted

There is no apparent request for an evidentiary hearing in this matter, and none would be appropriate even if there had been a request for such a hearing. "A defendant seeking an evidentiary hearing on a motion to suppress must provide sufficient information to enable the court to conclude that a substantial claim is presented and that there are disputed issues of material fact which will affect the outcome of the motion." *United States v. Juarez*, 454 F.3d 717, 719-20 (7th Cir. 2006). Defendant has come forward with absolutely no evidence to put the above proffered facts in dispute; in fact, based on Defendant's Motion, it appears that there is no dispute over the facts surrounding the February 3, 2021 search of the stolen car. As no such disputed issue of fact has been claimed by the Defendant, an evidentiary hearing would not be appropriate.

13

## **CONCLUSION**

Defendant's motion to suppress is wholly without merit. Defendant's motion must, therefore, be denied.

                                         Respectfully submitted,

                                         JOHN E. CHILDRESS
                                         Acting United States Attorney

                                         S:/ Michelle P. Brady
                                         Michelle P. Brady
                                         Assistant United States Attorney

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that on May 7, 2021, a copy of the foregoing United States' Response And Opposition to Motion to Defendant's Suppress was filed electronically. Notice of this filing will be sent to the following parties by operation of the Court's electronic filing system and a copy emailed to the court reporter. Parties may access this filing through the Court's system.

                By:   <u>/s/Michelle P. Brady</u>
                        Michelle P. Brady
                        Assistant United States Attorney