UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 1:21-cr-00069-SEB-DML |
| | ) | |
| DYLAN OSTRUM, | ) | |
| | ) | |
| Defendant. | ) | |

**ORDER DENYING DEFENDANT'S MOTION TO SUPPRESS**

This matter is before the Court on Defendant's Motion to Suppress [Dkt. 39], filed on April 15, 2021. Defendant Dylan Ostrum is charged in the Indictment with four felony offenses, including two violations of 21 U.S.C. §§ 841(a)(1), 841(b)(1)(D), and an 846 Conspiracy to Possess with Intent to Distribute and to Distribute Controlled Substances and a violation of 18 U.S.C. § 922(g)(1) Felon in Possession of a Firearm. Ostrum seeks to suppress all evidence obtained from the search of a rental vehicle, later determined to have been stolen, alleging that because the search was conducted without a warrant, his rights under the Fourth Amendment to the United States Constitution were violated as well as Article 1, Section 11 of the Indiana Constitution. Neither party has requested an evidentiary hearing and there is no dispute concerning the underlying facts. The Motion is fully briefed and, based on the applicable principles of law explicated below, the Motion to Suppress is hereby <u>DENIED</u>.

1

## I.     **Factual Background**

The factual background is drawn from the sworn statements of Officer Garland Cooper set forth in his Affidavit ("Affidavit") for a Search Warrant for Defendant Dylan Ostrum's residence. Special Agent Todd Bevington submitted a sworn declaration detailing the course of the investigation following the execution of the search warrant.[1] *See* Dkt. 41-1. On January 28, 2021, law enforcement officers with the Bureau of Alcohol, Tobacco, Firearms & Explosives ("ATF") and the Indianapolis Metropolitan Police Department ("IMPD") executed a search warrant at the residence of Ricky Blythe in Indianapolis, during which they seized Blythe's phone containing a large number of text messages, some of which revealed that Blythe had sold methamphetamine to Defendant ("Ostrum"), and Ostrum had sold marijuana to Blythe. Dkt. 41 at 2. This information was included in the Affidavit targeting Ostrum's residence. In addition, evidence derived from three confidential sources who had provided information to IMPD throughout the month of January 2021 regarding Ostrum's involvement in the trafficking of both firearms and drugs as a member of the "Hellraisers" gang in Indianapolis was included in the Affidavit. *See* Dkt. 41-1 at 7–20. Investigators had also supplied corroborative photographs of Ostrum from his social media (Facebook) account depicting a large "Hellraisers" tattoo on his back. *Id.* at 12.

---

[1] Mr. Ostrum has not provided a separate version of facts. His briefing consists of a background section taken from Special Agent Todd J. Bevington's sworn declaration. Mr. Ostrum maintains that the "facts are only allegations" and that he "does not concede the truth of any fact contained in the Background section [of his brief] for any purpose other than his motion to suppress." Dkt. 40 at 1 n.1.

The first confidential source (CS-1), after being arrested in January 2021, provided information on numerous firearms and narcotics traffickers in Indianapolis, including Ostrum. CS-1 identified the location of Ostrum's residence and reported that Ostrum drove a white Cadillac sedan. Based on this information, investigators drove to the Ostrum residence where they observed the white Cadillac parked in the yard, which they determined was registered to Ostrum at that address. They also observed a light blue newer model Chrysler 300 parked on Ostrum's property with a license plate also registered to Ostrum. After running a check on the plate, they learned that it did not match the Chrysler 300, but instead was registered to a different Cadillac automobile. CS-1 reported that he/she had been at Ostrum's residence on numerous occasions and had observed him to be in possession of numerous firearms as well as pound quantities of marijuana and ounce quantities of methamphetamine. CS-1 also indicated that Ostrum sold firearms from the residence, though he possessed numerous other firearms that he was unwilling to sell. *Id.* at 11–12.

According to the Affidavit, investigators had received information from a second confidential source (CS-2), who also had been inside Ostrum's residence on numerous occasions and had observed Ostrum to be in possession of numerous firearms, pound quantities of marijuana, and ounce quantities of methamphetamine, and had witnessed the sale/trade of drugs in exchange for a firearm. CS-2 informed the investigators that Ostrum was currently detained on house arrest at his residence, which agents later confirmed. Ostrum was driving a light blue Chrysler 300 sedan, which IMPD Officer Garland Cooper believed to be the Chrysler 300 they had seen parked at Ostrum's

3

residence with a license plate registered to a different Cadillac also belonging to Ostrum. *Id.* at 12–13.

The Affidavit recounted that in late January 2021, investigators had arrested a third confidential source (CS-3), who was found to be in possession of numerous firearms and large quantities of controlled substances. CS-3 told the agents that Ostrum was one of his/her primary methamphetamine customers and that he/she had been delivering several pounds of methamphetamine per week to Ostrum's residence for several months. CS-3 stated that Ostrum sold and traded firearms, but that he was unwilling to part with his personally owned firearms, which he stores at the residence. CS-3 consented to a search of his/her cell phone following his/her arrest where investigators found text messages and photographs involving controlled substances and several firearms. *Id.* at 13–15.

Based on this evidence, a search warrant was obtained from the Marion Superior Court for Ostrum's home and executed on February 3, 2021, which uncovered only small amounts of ammunition and marijuana, and no firearms. *Id.* at 2–3. As Special Agent Bevington averred in his sworn declaration, Ostrum was present during the search and, after waiving his *Miranda* rights, responded to the officer's questions. Among other disclosures, Ostrum acknowledged that he had assumed Blythe had been arrested because Blythe was supposed to have delivered drugs to him on the day of the arrest but never showed up. *Id.*

During his post-*Miranda* recorded interview, Ostrum was inquired of concerning a key ring that had been located in and seized from his residence pursuant to the search warrant. Ostrum identified the keys as belonging to a safe and a Chrysler 300,

4

maintaining that the safe was empty and did not contain drugs or guns because he "got rid of it" after Blythe got arrested. *Id.* at 3–4. Ostrum also stated that the Chrysler 300 was a rental car that he had moved along with the gun and "everything" else to his father's house located two hours away. *Id.* at 4.

Following the interview, the agents believed Ostrum that he had, indeed, moved contraband (drugs, drug proceeds, and firearms) to a different location following the arrest less than one week prior of Ricky Blythe, who was his methamphetamine source. They continued their investigation which eventually led them to discover the Chrysler 300 sedan, previously seen parked at Ostrum's residence, now located in the driveway of one of Ostrum's known associates at 2514 S. Lockburn Street, Indianapolis, Indiana, 46241. Investigators spoke with the occupant of the residence in whose driveway the Chrysler 300 was parked, who advised that Ostrum had parked the vehicle there the previous day and locked it without providing any keys to the occupant. The occupant of the residence signed a consent form allowing an IMPD K-9 officer and his certified narcotics K-9 dog to run an "open-air" sniff on the area around the Chrysler. The K-9 dog failed to detect any odor of narcotics emanating on or from the Chrysler. *Id.* at 4–5.

During the course of conducting the "open-air" sniff of the area, the officers took note of the Chrysler's Vehicle Identification Number (VIN) that was visible through the windshield. They ran the VIN through the available law enforcement databases which revealed that the Chrysler 300 was a rental car that had been reported stolen in October 2020 and was listed in the National Crime Information Center (NCIC). Having determined the vehicle to be stolen, investigators tried the keys previously seized from

5

Ostrum to open the car in order to conduct an inventory search preparatory to towing and impounding it for return to the owner. *Id.* at 5. The inventory search was conducted in accordance with the requirements of IMPD Policy authorizing "[a]n administrative, routine, and warrantless search of the passenger area (including the glove compartment), trunk, *and closed containers*, prior to lawfully towing a vehicle." Dkt. 41-2 at 2 (emphasis added).

Inside the vehicle, investigators located two safes, one on the backseat of the passenger compartment and one in the trunk. Again, utilizing the keys they had previously seized from Ostrum's keychain, investigators unlocked the safes, finding inside of the trunk safe a loaded Glock 9 mm pistol, 513.5 grams of methamphetamine (actual), and what appeared to agents to be a drug ledger, and finding inside the backseat safe an extended Glock magazine loaded with 9 mm ammunition, approximately two pounds of marijuana, and a digital scale. No other items of evidentiary value were located during the inventory search of the vehicle, which was thereafter towed from the property.

Eventually, Avis Rental Car retrieved the car on February 9, 2021, from the IMPD Tow Lot. According to Avis's records, the car had originally been rented by a female who never returned it, and Ostrum's name was not listed as an authorized driver on the rental agreement. Dkt. 41 at 6–7. The items seized from these safes are the focus of Defendant's motion to suppress evidence in his upcoming trial.

**II.    Discussion**

Defendant Ostrum contends that the evidence obtained from the search of the Chrysler 300 must be suppressed because no warrant authorized either the search of the

vehicle or the locked safes found therein. The officers' failure to obtain a warrant prior to the search, Ostrum contends, was a violation of his rights under the Fourth Amendment to the United States Constitution and Article 1, Section 11 of the Indiana Constitution.[2]

The Fourth Amendment provides that people shall be "secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." The Supreme Court has repeatedly held that "searches conducted outside the judicial process, without prior approval by judge or magistrate, are *per se* unreasonable under the Fourth Amendment -- subject only to a few specifically established and well-delineated exceptions." *United States v. Colbert*, No. 1:18-cr-00395-TWP-DLP, 2019 WL 2422595, at *2 (S.D. Ind. June 10, 2019) (quoting *Katz v. United States*, 389 U.S. 347, 357 (1967)). The burden is on the Government to establish a sufficient justification for a warrantless search or seizure. *See Vale v. Louisiana*, 399 U.S. 30, 34 (1970).

Here, the Government argues that Ostrum's motion to suppress requires denial for any one of three reasons: (1) Ostrum lacks standing to object to the search of the stolen Chrysler 300 for which he can show no lawful possessory interest; (2) the officers had sufficient probable cause to search the Chrysler 300, based on Ostrum's voluntary statements made to officers on February 3, 2021; and (3) the inventory search of the stolen car conducted in conjunction with its being towed by IMPD and retained for

---

[2] We decline Defendant's invitation to analyze the issues raised here under the Indiana Constitution. The evidence Defendant seeks to suppress was obtained and, we assume, will be proffered by the government in the upcoming federal trial based on the charges in the Indictment. The admissibility of the challenged evidence is thus subject to review according to the requirements imposed by the Fourth Amendment to the United States Constitution, not under state law. *See California v. Greenwood*, 486 U.S. 35, 43 (1988).

delivery to its rightful owner, Avis Rental Cars, pursuant to IMPD General Order 7.3 made the discovery of and seizure of this evidence by law enforcement inevitable. We address these arguments in turn below.

### A. Standing

Defendant Ostrum maintains that, contrary to the Government's argument that he lacks standing to object to the search because he has no possessory right in a stolen vehicle, he does have standing to challenge the search because he had a reasonable expectation of privacy in both the Chrysler 300 and the locked safes contained inside. To determine whether Ostrum has standing to challenge the investigative officers' search, Ostrum "bears the burden of establishing that he had both a subjective and an objectively reasonable expectation of privacy." *See, e.g.*, *United States v. Tomlinson*, 190 F.Supp.3d 834, 842 (S.D. Ind. 2016) (quoting *United States v. Walton*, 763 F.3d 655, 658 (7th Cir. 2014)) (internal quotation marks omitted). The subjective prong of the reasonable expectation analysis involves a "fact-specific inquiry that looks 'to the individual[']s] affirmative steps to conceal and keep private whatever item was the subject of the search,'" *Walton*, 763 F.3d at 658 (quoting *United States v. Yang*, 478 F.3d 832, 835 (7th Cir. 2007)), and the objective prong consists of the "privacy expectations society is willing to accept as reasonable." *United States v. Tuggle*, 4 F.4th 505, 514 (7th Cir. 2021).

The Supreme Court recognizes that "there is a diminished expectation of privacy in automobiles, which often permits officers to dispense with obtaining a warrant before conducting a lawful search." *Byrd v. United States*, 138 S. Ct. 1518, 1526 (2018); *see*

*also California v. Acevedo*, 500 U.S. 565, 579 (1991). Here, the officers' observation of the VIN which was in plain view through the windshield was not an intrusion on any claimed privacy right by Ostrum, and their investigative step of running the VIN through law enforcement databases was also reasonable and permissible. *See New York v. Class*, 475 U.S. 106, 114 (1986) (holding that there is no reasonable expectation of privacy in the VIN). After discovering that the vehicle was stolen and that Ostrum's name was not on the rental contract, Ostrum had no protectable property interest in the vehicle and thus cannot establish either a subjective or objective expectation of privacy in the vehicle or its contents. *Byrd*, 138 S. Ct. at 1526 ("No matter the degree of possession and control, the car thief would not have a reasonable expectation of privacy in a stolen car."); *Walton*, 763 F.3d at 665 (stating that certain violations of a rental agreement, including keeping the vehicle months beyond its return date, "may be so egregious that society would no longer be prepared to respect a privacy interest in the car").

      Ostrum asserts that he was unaware that the vehicle was stolen and relies on *Byrd* for the proposition that "someone in otherwise lawful possession and control of a rental car has a reasonable expectation of privacy in it even if the rental agreement does not list him or her as an authorized driver." *Byrd*, 138 S. Ct. at 1524. Ostrum's argument collapses with the phrase "*lawful* possession and control." The car, rented by a third party and never returned, was the property of Avis Rental Cars. Ostrum concedes that the car was a rental and that he had no connection at all to the initial car theft. Even so, he cannot establish an expectation of privacy because, by well-established precedent, a "driver of a stolen car does not have standing to challenge a car search." *Walton*, 763 F.3d at 665

9

(citing *United States v. Sholola*, 124 F.3d 803, 816 n.14 (7th Cir. 1997)). Clearly, Ostrum cannot establish a reasonable expectation of privacy in the vehicle.

Even if he did not have a reasonable expectation of privacy in the interior of the vehicle, Ostrum maintains that he had an expectation of privacy with respect to the locked safes contained inside the car and because the investigatory officers used his keys to open the locked safes, they exceeded their authority. Ostrum has not challenged the legal sufficiency of the warrant authorizing the search of his residence, or the execution of the search warrant, or the accuracy of the *Miranda* warnings he received. Therefore, Ostrum's verbal statements explaining his connection to the vehicle and the enclosed safes are admissible. Similarly, the officers, who were in lawful possession of the seized keys, were authorized to use those keys to try to open the safes. Ostrum lacked a possessory interest to property located inside of a stolen vehicle for the same reasons. *See Newman v. United States,* No. 20-CR-19-1-JPS, 2020 WL 4035552, at *3 (E.D. Wis. July 17, 2020); *United States v. Caymen*, 404 F.3d 1196, 1200 n.16 (9th Cir. 2005) (collecting circuit court cases holding that an individual "does not have a reasonable expectation of privacy that entitles him to suppress what is found in a search of the stolen car"). We thus hold that Defendant, lacking a reasonable expectation of privacy in the safes, has no standing to challenge the constitutionality of the search.

### B. Probable Cause

Apart from the lack of a reasonable expectation of privacy in the stolen vehicle and its contents, the search was also reasonable under the automobile exception to the search warrant requirement, which allows officers to search an automobile without a

10

warrant when there is probable cause to believe that the search will uncover contraband or evidence of crime. *United States v. Pittman*, 411 F.3d 813, 817 (7th Cir. 2005) (citations omitted). "Probable cause to search a vehicle exists when, based on the totality of the circumstances, 'there is a fair probability that contraband or evidence of a crime will be found in a particular place.'" *United States v. Sands*, 815 F.3d 1057, 1063 (7th Cir. 2015) (quoting *Illinois v. Gates*, 462 U.S. 213, 238 (1983)). The scope of the search is defined not by the "nature of the container in which the contraband is secreted" but "by the object of the search and the places in which there is probable cause to believe that it may be found." *United States v. Ross*, 456 U.S. 798, 824 (1982). "This rationale from *Ross* on where to draw the line for a proper search has been regularly applied by federal and state courts, including this court." *United States v. Kizart*, 967 F.3d 693, 696 (7th Cir. 2020).

Ostrum argues that the automobile exception does not apply here because the K9 dog's failure to alert to the presence of drugs dissipated any suspicion that the vehicle contained contraband.[3] The officers knew from their investigation that Ostrum was actively involved in drug dealing. When, after waiving his *Miranda* rights following the execution of the search warrant at his home, Ostrum informed officers that he had "got

---

[3] Ostrum also raised arguments that the automobile exception does not apply because the vehicle was parked on private property and was not readily mobile because the officers were in possession of the vehicle's keys. He contends that the facts of his case present a new question for this Court regarding the automobile exception as applied to a vehicle located on the curtilage of the home of someone other than the driver of the vehicle. These arguments do not diminish the officers' probable cause to believe that the vehicle contained evidence of criminal activity and need not be analyzed in depth because, as explained above, Ostrum lacked a cognizable property interest in the stolen vehicle and its contents.

rid of" his contraband and at least one firearm, asserting that these items were moved along with the car to his father's house, they had reason to doubt that explanation. When the officers' investigation determined that the vehicle was actually parked at an associate's house, that discovery along with the other information they possessed, gave them probable cause to believe that the car likely contained the missing contraband. The search warrant was not the source of the authority for the officers' actions after its execution was complete. Each investigative step thereafter by the agents must be (and was) justified on the basis of the officers' authority to proceed with their investigation in a step-by-step fashion, augmenting their probable cause to believe that the car contained evidence of Defendant's drug trafficking activities. A warrant was not required under the circumstances outlined here to authorize the search of the containers in the stolen vehicle. *United States v. Richmond*, No. 1:12-CR-00096-TWP, 2013 WL 1775724, at *4 (S.D. Ind. Apr. 25, 2013) ("When there is probable cause to search a vehicle, law enforcement may search closed containers found in the automobile that may contain contraband that the police have probable cause to seek.").

### C. Inventory Search

Finally, the Government asserts that the discovery of the contraband was inevitable because, once it was determined that the vehicle was stolen, the officers were entitled to conduct an inventory search preparatory to its being towed to the impound lot to be retrieved by the rightful owner, to wit, Avis Rental Cars. "Inventory searches are a recognized exception to the warrant and probable-cause requirements of the Fourth Amendment." *United States v. Cherry*, 436 F.3d 769, 772 (7th Cir. 2006). Inventory

12

searches are permissible "to protect an owner's property while it is in the custody of the police, to insure against claims of lost, stolen, or vandalized property, and to guard the police from danger." *United States v. Duguay*, 93 F.3d 346, 352 (7th Cir.1996) (internal citation and quotation marks omitted); *see also South Dakota v. Opperman*, 428 U.S. 364 (1976). Inventory searches performed by officers before impounding and towing a vehicle are lawful if conducted in accordance to standard police procedures intended to protect the owner's property and to protect the police from the owner charging them with having stolen, lost, or damaged his property. *Cherry*, 436 F.3d at 772. "Requiring sufficient regulation of inventory searches ensures that a police procedure is not merely a pretext for concealing an investigatory police motive. But the fact that an inventory search may also have had an investigatory motive does not invalidate it." *United States v. Lomeli*, 76 F.3d 146, 148 (7th Cir. 1996).

Ostrum maintains that the officers were motived by a desire to find evidence related to his suspected drug dealing, as evidenced by their inventorying the vehicle at the scene instead of the impound lot. This procedure requires the suppression of the evidence that was discovered. However, as discussed, the officers had probable cause to believe that there could be unsecured firearms, various controlled substances, and drug proceeds inside the car. Therefore, in addition to lawful permission to search the vehicle generally, they had a valid safety interest before towing it to the impound lot in ensuring no such item was inside of the vehicle. *See United States v. Sholola*, 124 F.3d 803, 818 (7th Cir. 1997) (noting that inventory searches serve the important, non-investigatory interest of protecting police from potential danger).

Ostrum objects to the IMPD Policy on the grounds that it does not contain any guidance regarding whether to open locked containers found during an inventory search and the lack of such guidance requires the suppression of the evidence found in the locked safes. He cites *United States v. McPhaul*, No. 1:14-cr-00203-TWP-TAB, 2015 WL 4193056, at *5–7 (S.D. Ind. July 10, 2015) to support this contention, but in that case the opening of a locked safe in an automobile was deemed unreasonable because the officers failed to establish that there was an established policy or procedure to open closed or locked containers. By contrast, the IMPD Policy clearly states that an inventory search requires the opening of closed containers. *See* Dkt. 41-2 at 2; *see also United States v. Kordosky*, 921 F.2d 722, 724 (7th Cir. 1991) (affirming the denial of a motion to suppress evidence found in a locked compartment in a sidewall of a trunk after finding that the police unit had an official, unwritten, standard policy to open any and all closed containers found within the vehicles). Here, the IMPD Policy clearly mandates the opening of closed containers as a part of the department's written formally adopted procedures. We view locked safes as analogous to the locked compartment in a sidewall of a trunk. We therefore hold that the inventory search at issue here was conducted in accordance to established IMPD procedures and the evidence does not require suppression on this basis.

### III. Conclusion

The case law and facts before us here favor the Government. Accordingly, suppression of the evidence is not warranted and Defendant's Motion to Suppress [Dkt. 39] is hereby <u>DENIED</u>.

IT IS SO ORDERED.

Date: 10/15/2021

_SARAH EVANS BARKER, JUDGE_
United States District Court
Southern District of Indiana

Distribution:

Jonathan A. Bont
PAGANELLI LAW GROUP
jon@paganelligroup.com

Michelle Patricia Brady
UNITED STATES ATTORNEY'S OFFICE (Indianapolis)
michelle.brady@usdoj.gov